**Dated: August 11, 2017**

**The following is ORDERED:**





Janice D. Loyd
U.S. Bankruptcy Judge

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 16-12120-JDL |
| Michael Allan Baumgardner and | ) | Chapter 7 |
| Tyelinda Maxine Baumgardner, | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| First State Bank, Noble, an | ) | |
| Oklahoma Banking Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ADV. NO. 16-01089JDL |
| | ) | |
| Michael Allan Baumgardner and | ) | |
| Tyelinda Maxine Baumgardner, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER DETERMINING DEBT DISCHARGEABLE**

**I. Introduction**

This adversary proceeding is before the Court for decision after a trial conducted

on August 1, 2017.   Plaintiff, First State Bank of Noble, Oklahoma (the "Bank"), commenced this adversary proceeding seeking to have the debt owed it by Defendants/Debtors Michael and Tyelinda Baumgardner (collectively referred to as the "Baumgardner's" or individually as "Mike" and "Tye") determined non-dischargeable under 11 U.S.C. § 523(a)(2)(A) as having been incurred by false pretenses, misrepresentation or actual fraud.

After hearing the arguments of counsel, considering all the documentary and testimonial evidence and weighing the credibility of the witnesses, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Rule 52 of Federal Rules of Civil Procedure, made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure.   For the reasons set forth herein, the Court finds that the Bank has failed to meet it burden of proof that the debt owed it by the Debtors is non-dischargeable.   A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.[1]

## II.  Jurisdiction

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334(a) and (b) and 157(a) and (b).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) as it concerns a determination as to the dischargeability of a particular debt.  All parties are properly before the Court and have consented to the entry of judgment.  See 28 U.S.C. § 157(c)(2).  Venue is proper under 28 U.S.C. § 1409(a).

---

[1] All future references to "Bankruptcy Rule" or "Bankruptcy Rules" are to the Federal Rules of Bankruptcy Procedure, unless otherwise indicated.  All further referenced to "Code", "Section", and "§" are to the Bankruptcy Code, title 11 of the United States Code, unless otherwise indicated.

### III. Factual Findings[2]

1. The Baumgardners filed a voluntary joint petition under Chapter 7 of the Bankruptcy Code on May 31, 2016.

2. Mike is a high school graduate with some college attendance. He was employed by A&R Marine, Inc., ("A&R") a company primarily owned and operated by his father Al. Mike and Tye did have an ownership interest in the company, but was unsure as to the exact amount owned. He along with his wife, Tye, owned several rental houses and currently own a business, Rock & Wood, LLC. Mike testified that he has ADHD and is dyslexic. As a consequence, he testified that he was not involved in the paperwork or the finances of any of his business interests or his personal affairs, deferring to Tye as the party primarily involved in such matters.

3. Tye holds a master's degree in speech pathology from University of Oklahoma and has been a practicing speech pathologist for aproximately fifteen years. While she was an officer of A&R, and did participate in the day-to-day operations of the business, she did not receive a paycheck from A&R. She agrees that she handles all the financial aspects of the current and past businesses.

4. Kim King is the CEO and President of the Plaintiff, First State Bank of Noble as well as a shareholder by virtue of her family having purchased an ownership interest in the Bank in the 1960s. King and Al Baumgardner were law school classmates and had both a personal, social and banking relationship for approximately thirty years. When Al

---

[2] Most of the testimony elicited in this litigation with respect to certain facts was not conflicting; however, to the extent necessary, the findings of fact rendered herein reflect the Court's determination of the credibility of the witnesses.

decided to go into the boating business in approximately 2009 he came to King and the Bank for loans and floor planning for A&R.

5.   Beginning in January 2009, A&R, acting through Al as President, entered into a series of loan agreements/promissory notes, the last of which was executed in January 2013. [Ex.27].  On January 6, 2009, Mike and Tye each executed Guaranty Agreements unconditionally guaranteeing all present and future indebtedness of whatsoever nature of A&R. [Ex. 27, pgs. 0224-0227].  As of February 26, 2015, the total A&R indebtedness guaranteed by Mike and Tye was approximately $225,000. [Ex. 25, pg.0078].

6.   One of the rental properties owned by Mike was located at 1232 Caddell Lane, Norman, Oklahoma (the "Caddell" property).   On July 19, 2006, Mike executed a Promissory Note in the amount of $120,000.00 with SunTrust Mortgage, Inc. ("SunTrust"), for the purchase of the Caddell property. [Ex. 11, ex. A].  While she had no *in personam* liability in the transaction, Tye, as Mike's spouse, executed a Mortgage in favor of SunTrust. [Ex. 11, ex. B].

7.   In September 2014, the Mortgage on the Caddell property became delinquent. By letter dated December 25, 2014, addressed to Mike, Specialized Loan Servicing LLC ("SLS"), the successor in interest to the original mortgagee SunTrust, gave a "debt validation letter" that the loan on Caddell had a balance of $104,297.08. [Ex.1].  The letter was sent to Mike at 7141 S. Western, Oklahoma City, Oklahoma.  Mike and Tye both testified that address was a "mail drop" business which had been closed months earlier and as a consequence neither had seen this letter previously.  Tye did testified that she was aware that she had missed payments to SLS in 2014.

8.   By a "collection letter" dated January 14, 2015, to Mike, SLS stated that the

4

Caddell "mortgage is in serious default and foreclosure process may be imminent." [Ex.2]. The letter was mailed to the address at 7141 S. Western, and both Mike and Tye testified that they did not remember seeing the letter.

9.    By letter to Mike dated February 24, 2015, entitled "Notice of Default and Notice of Intent to Foreclose" SLS  stated that the recipient had thirty-three days of the date of this letter to cure the default and failure to do so may result in acceleration of the entire balance outstanding in the commencement of foreclosure proceedings. [Ex.3].  The letter was addressed to Mike at the Caddell address as well as sent certified to Mike and Tye's home address.  Mike testified he did not recall seeing the letter. Tye testified that she did receive the certified letter from SLS but did not recall talking to anyone at SLS regarding the letter.

10.    Tye testified that all of the notes on their rental properties, including Caddell, were past due.  She or her realtor had been in contact with Wells Fargo Bank, which held mortgages on three properties, and they were attempting to sell those properties to avoid foreclosure.   Tye listed the Caddell property, which Mike had purchased in 2006 for $150,000.00 [Ex. 7], with a realtor, Robin Munger, on February 18, 2015, at a price of $165,000.00. [Ex. 6].

11.    By letter from King to Mike and Tye dated March 19, 2015, the Bank gave notice that it was "calling" all the notes of A&R which they had guaranteed.  The letter confirmed "our recent discussions that you do not have the cash to meet your obligations" and that the Bank had downgraded their credit from "substandard" to "doubtful". [Ex. 21]. King concluded the letter with "I know that you will deal with this difficult situation with your usual honor and integrity".

12.    King testified that she probably talked to Al after the March 19, 2015, letter as

5

she was primarily working with him in attempting to resolve the A&R indebtedness. King didn't remember any specific discussions with Mike and Tye regarding attempts to resolve the situation with the Bank prior to the submission of a Proposal for Surrender prepared by Al around April 6, 2015.

13.   In the first week of April 2015, Al submitted to the Bank a Proposal for Surrender. [Ex. 5]. King, Mike and Tye all testified that Al prepared the Proposal for Surrender. The Proposal for Surrender offered to give the Bank previously unencumbered property owned by Al , A&R, Mike and Tye as additional collateral to be liquidated with the proceeds being paid to the Bank to be applied to the unpaid loan balances. The Proposal provided, in part:

> "Mike and Tye own a rent house at 1232 Caddell St. in Norman. It is listed for sale at $165,000.00 and has a Mortgage of $108,000.00. Leaving equity of around $57,000.00. It should net them around $40,000.00. They are willing to pledge this in any reasonable format the Bank wants provided all funds go first to payment of missing collateral."

The "missing collateral" was referring to two boats and trailers in which the Bank held a security interest, and which Al had admitted to King that he had sold or otherwise disposed of without remitting the proceeds to the Bank-"sold out of trust". King testified that she had no evidence that Mike or Tye had been involved in any alleged out of trust sales.

14.   After receiving the Proposal for Surrender King did some due diligence to verify some of the values set forth in the Proposal. The Bank had a full appraisal done on the property located at 900 Front Street in Norman, Oklahoma, at which A&R had been located. As to the Caddell property, King testified that she had a "drive-by" appraisal done, and she examined the county tax assessor's records. The tax assessor placed the value of the Caddell property at $131,180.00. [Ex.7]. King testified that in valuing the Caddell

property she relied upon both Mike and Tye's and the tax assessor's valuations.  King was aware that the Caddell property was subject to a first mortgage.  While the Bank had not done an appraisal of the Caddell property, King had no reason to think that Tye didn't believe the property was worth approximately $165,000.00 at which she had originally listed it.  King knew that the listing price had been later dropped to $155,000.00.

15.    By letter of May 13, 2015, King sent the final proposed Loan Settlement Agreement ("Agreement"). [Def. Ex. 4].  In one of the few factual disputes in the testimony, King testified that Al drafted a Loan Settlement Agreement (the "Agreement") while there was other evidence that the Agreement was drafted by counsel for the Bank.  The Agreement provided that A&R, as borrower, and Al, Mike and Tye, as guarantors, would either sell (surrender) personal property to the Bank [Ex.10] for the purpose of helping to liquidate the Bank indebtedness, and that Mike and Tye would grant the Bank a second mortgage on the Caddell property. [Ex. 18, ex. D].  The letter from King urged Al, Mike and Tye to execute the Agreement, and "if you do not, because of your sale of assets out of trust, the bank would even more vigorously pursue civil and criminal penalties." [Def. Ex. 4].

16.  The Agreement was executed at the Bank on June 18, 2015. [Ex.9].  All parties to the Agreement were represented by counsel.  In so far as Mike and Tye were concerned, the Agreement provided that they would agree to execute a second mortgage in favor of the of the Bank on the Caddell property in the amount of $35,000.00;  when the property was sold, after the payment of the first mortgage and costs of sale, the remaining proceeds would be paid  to the Bank and the Bank would execute a release of  the second mortgage.  If the proceeds to the Bank were $35,000.00, Mike and Tye would be released

7

of all liability to the Bank.  If the proceeds were less than $35,000.00 but more than $25,000.00 the Bank would release its lien to facilitate the sale, and Mike and Tye would begin to make payments over a five-year period to pay the difference between the $35,000.00 and the proceeds received.

17.   On the same date that the Agreement was executed, Mike and Tye executed a Credit Application to which the Bank attached an In File Credit Report (also prepared on June 18, 2015) for each of them prepared by CBCinnovis, the credit reporting agency regularly used by the Bank. [Ex.8].  The Credit Reports of both Mike and Tye stated: "SERIOUS DELINQUENCY, AND PUBLIC RECORD OR COLLECTION FILED; TIME SINCE DELINQUENCY IS TOO RECENT OR UNKNOWN; PROPORTION OF REVOLVING BALANCES TO REVOLVING CREDIT LIMITS IS TOO HIGH; NUMBER OF ACCOUNTS WITH DELINQUENCY." [Ex. 8, pgs.0761 and 0770].  Tye's Credit Report gave her a credit score of 477, and Mike had a credit score of 502.  King testified that these credit scores were "not good".  At the time the Agreement was executed King knew that Mike and Tye were having financial problems, the business was not doing well and that they were behind on their substantial credit card debt.

18.   King, Mike and Tye all testified that at no time prior to or at the time of the execution of the Agreement did Mike or Tye state whether or not they were current on payments on the first mortgage.  King testified that at no time prior to the execution of the Agreement did she ask Mike or Tye the status of the first mortgage.  There is no reference in any of the documents, including the Agreement, that Mike or Tye made representations

8

to the Bank that they were current on all their obligations.[3]

19.   Seven days after the execution of the Agreement, on June 25, 2015, SLS filed its Petition for Foreclosure of Mortgage in the District Court of Cleveland County, seeking to foreclose its mortgage on the Caddell property. [Ex. 11].   Mike and Tye were served with summons and a copy of the Petition on July 6, 2015. [Ex's 12 and 13].  The Bank was not named as a defendant in the foreclosure because it had only filed its Mortgage of record on June 24, the day before SLS filed its Petition. [Ex.18, ex. D].  They did not tell the Bank about the foreclosure because Tye believed that the property would be sold before any possible foreclosure sale.  She and Mike had other rental properties whose mortgages with Wells Fargo were in default and  Wells Fargo was working with them to get the property sold without foreclosure.

20.   After the execution of the Agreement, Tye continued her efforts to sell the Caddell property.  It would have taken a sales price of approximately $140,000.00 in order to get the Bank paid at least $20,000.00.  As of October 1, 2015, the highest bid Tye had received was $110,000.00. [Ex. 4, pg. 0080].  Tye couldn't accept that offer as the Bank would not be willing to release the Mortgage for that amount. [Ex.4, pg.0067].

21.   On September 2, 2015, a  Final Journal Entry of Judgment was entered in favor of SLS for a monetary judgment and foreclosure of the Caddell property mortgage. [Ex. 15].  The property was sold at sheriff's sale on October 15, 2015, but the sale was vacated when SLS was informed that the Bank's mortgage had been filed of record before the

---

[3]The Bank's factual contention that "Defendants made material representations to Plaintiff that Defendants were current on all obligations owed to the first mortgage holder on the Rental Property" was clearly not supported by the evidence. [Final PreTrial Order, II.(A)(1)].

institution of the foreclosure proceedings.  On November 17, 2015, SLS filed a De Novo Petition for Foreclosure of Mortgage which named the Bank as an additional Defendant. [Ex. 17].  When the Bank was served with summons it was the first time that it knew that SLS's first mortgage was delinquent, in default or that foreclosure proceedings had been instituted.

22.  In the second foreclosure proceeding, judgment was rendered in favor of SLS and the Bank and the property sold at sheriff's sale.  After the application of the sale proceeds to SLS's first mortgage, the sum of $3,737.75 was applied as a credit toward the Bank's note and Mortgage, and on February 3, 2016, a deficiency judgment in favor of the Bank was entered in the amount of $34,736.34, plus interest. [Ex. 20].

23.  At the time of the filing of the bankruptcy on May 31, 2016,  the balance of the debt owed to the Bank was $36,215.33.

## IV.  The Law

### A. Exceptions to Discharge-General Considerations

The "central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.'"  *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654 (1991) (citing *Local Loan Co. V. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695(1934)).  In order to effectuate this "fresh start" policy of bankruptcy relief, exceptions to discharge are narrowly construed with all doubts resolved in the Defendant's favor.  *Bellco First Federal Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997); *Chevy Chase*

*Bank, FSB v. Kukuk  (In re Kukuk)*, 225 B.R. 778, 782 (10th Cir. BAP 1998); *Miller v. Gentry (In re Miller)*, 55 F.3d 1487, 1489 (10th Cir. 1995), *cert. denied*, 516 U.S. 916, 116 S.Ct. 305 (1995).  It is a well-established rule that exceptions to discharge are to be construed strictly against a creditor and liberally in favor of the debtor.  *See, Kawaauhua v. Geiger*, 523 U.S. 57, 118 S.Ct. 974 (1998).  The burden of proof for establishing an exception to discharge is a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 286-87, 111 S. Ct. 654, 659-60 (1991).

**B. Section 523(a)(2)(A)**

Section 523(a)(2)(A) is phrased in the disjunctive, meaning that false pretenses, false representation and actual fraud are three separate grounds for non-dischargeability, and these independent causes of action require proof of different elements.  *Bank of Cordell v. Sturgeon (In re Sturgeon)*, 496 B.R. 215, 222-223 (10th Cir. BAP 2013); *In re Munoz*, 536 B.R. 879, 884 (Bankr. D. Colo. 2015); *In re Call*, 560 B.R 814. 821(Bankr. D. Utah  2016).  While the elements for each theory under § 523(a)(2)(A) differ, the common thread is a debtor's intent to defraud a creditor.  *Munoz,* 536 B.R. at 884; *Fowler Brothers v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996).  Because false pretenses, false representation and actual fraud represent different concepts, they have somewhat different meanings and each one merits a brief discussion.  The Court will outline the elements for each cause of action in the order outlined in § 523(a)(2)(A).

**1. False Pretenses**

False pretenses under § 523(a)(2)(A) are implied misrepresentations intended to create and foster a false impression.  *In re Sturgeon*, 496 B.R. 215, 223 (10th Cir. BAP

11

2013).    Unlike false representations, which are express misrepresentations, false pretenses include conduct and material omissions. *Id*.; see also *Marks v. Hentges (In re Hentges),* 373 B.R. 709, 725 (Bankr. N.D. Okla. 2007) (false pretenses are "implied misrepresentations or conduct intended to create and foster a false impression."); *Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1374-75 (10th Cir. 1996) (failure to disclose may constitute a false representation or false pretenses); *Harmon v. Kobrin, (In re Harmon)*, 250 F.3d 1240, 1246 n.4 (9th Cir. 2001); *The William W. Barney, M.D. P.C. Retirement Fund v. Perkins (In re* Perkins*)*, 298 B.R. 770, 788 (Bankr.D. Utah 2003) (stating that "[a] false pretense as used in § 523(a)(2)(A) includes material omissions, and means 'implied misrepresentations or conduct intended to create and foster a false impression.'").    *Call*, 560 B.R. at 821 (Bankr. D. Utah 2016) ("false pretenses can be 'defined as any series of events, when considered collectively, that create a contrived and misleading understanding of the transaction, in which a creditor is wrongfully induced to extend money or property to the debtor.'" (citing *Stephens v. Antonious (In re Antonious)*, 358 B.R.172, 182 (Bankr. E.D. Pa 2006)).

### 2. Misrepresentation

To prove that a debt arose from false representation, the Plaintiff must prove by a preponderance of the evidence the traditional, long-standing elements for proving misrepresentation or fraud under the common law of torts in the Restatement (Second) of Torts, § 525 (1976) as understood when § 523(a)(2)(A) was enacted in 1978.    See *Fields v. Mans*, 516 U.S. 59, 69 n.9, 116 S.Ct. 437, 443-44 (1995).    Those elements are (1) that the debtor made a false representation; (2) the representation was made with the intent

12

to deceive the creditor; (3) the creditor relied on the false representation; (4) the creditor's reliance was justifiable; and (5) the creditor was damaged as a result. *Id.; Fowler Brothers v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996); *In re Riebesell*, 586 F.3d 782, 789 (10th Cir. 2009); *In re Hentges*, 373 B.R. 709, 724 (Bankr. N.D. Okla. 2007).   An intent to deceive may be inferred from a "reckless disregard for the truth or falsity of the statement combined with sheer magnitude of the resultant misrepresentation." *Equitable Bank v. Miller, (In re Miller),* 39 F.3d 301, 305 (11th Cir. 1994).   Nevertheless, an honest belief, even if unreasonable, that a representation is true and that the speaker has information to justify it does not amount to an intent to deceive.

### 3. Actual Fraud

In *Husky International Electronics Inc. v. Ritz*, ___U.S.____, 136 S.Ct. 1581 ( 2016) the Supreme Court stated that, to the extent "actual fraud" is alleged, such term does not require an actual misrepresentation on the part of the wrongdoer. *Id.* at 1587.  Often times, prior to *Husky,* courts used the terms "fraudulent representation" or "actual fraud" interchangeably; however, *Husky* clearly recognized the distinction between the various causes of action set forth in § 523(a)(2)(A).   The Supreme Court did not define with precision what acts constituted "actual fraud"; rather, it cryptically noted the term "fraud" has been defined broadly to be "anything that counts as fraud and is done with wrongful intent" and connotes "deception or trickery". *Id.* at 1586; *Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1,11 (10th Cir. BAP 2016); *Call*, 560 B.R. at 821.  This definition is similar to that stated by the Tenth Circuit BAP in *Diamond v. Vickery (In re Vickery)*, 488 B.R. 680, 690 (10th Cir. BAP 2013) wherein the court held that "[w]hen a debtor

13

intentionally engages in a scheme to deprive or cheat another of property or legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code." Wrongful intent can be manifested "when a debtor intentionally engages in a scheme to deprive or cheat another of property or legal right." *Thompson,* 555 B.R. at 10.

## C. Common Elements to Any § 523(a)(2)(A) Cause of Action

Although false pretenses, false representation, and actual fraud represent different concepts, the elements of scienter, reliance, and materiality are common to all and must be proven by a preponderance of the evidence in order for the creditor to prevail.

### 1. Scienter-Intent

In the Tenth Circuit any of the three types of conduct specified in § 523(a)(2)(A) (false pretenses, misrepresentation or actual fraud) have been narrowly construed to limit the harsh result of nondischargeability to "frauds involving moral turpitude or intentional wrong." *In re Johnson*, 477 B.R. 156, 169 (10th Cir. BAP 2012). "[F]raud implied in law or which may arise in the absence of bad faith or immorality" is not sufficient. *Id.*; *Kukuk,* 225 B.R. at 787 (quoting *Driggs v. Black (In re Black)*, 787 F.2d 503, 505 (10th Cir. 1986) (abrogated on other grounds by *Grogan*, 498 U.S. 279, 111 S.Ct. 654). The debtor must have acted with the subjective intent to deceive the creditor. *First National Bank v. Cribbs (In re Cribbs)*, 327 B.R. 668, 674 (10th Cir. BAP 2005), *aff'd,* 2006 WL 1875366 (10th Cir. 2006).

Because fraudulent intent is rarely admitted by a debtor, courts uniformly recognize it may be established by circumstantial evidence or by inferences drawn from a course of

14

conduct or from the totality of the circumstances. *Cribbs*, 327 B.R. at 673; *Copper v. Lemke (In re Lemke),* 423 B.R. 917, 922 (10th Cir. BAP 2010) (citing *Young*, 91 F.3d at 1375). Making a representation to a creditor with a "reckless disregard for the truth" may be some evidence of an intent to deceive the creditor. *Cribbs* at 673. However, a finding of "reckless disregard for the truth" translates into subjective intent to deceive (i.e. scienter) only in very narrow circumstances. *Id*.; *Kukuk*, 225 B.R. at 787; *Johnson*, 477 B.R. at 169. Accordingly, a debtor's credibility is an important factor in finding or rejecting a finding of fraudulent intent.

### 2. Justifiable Reliance

The Supreme Court has held in the context of a case involving the dischargeability of a commercial loan and personal guarantee that causation must be proven under § 523 (a)(2)(A) by a showing of actual and justifiable reliance on the part of the objecting creditor. *Field v. Mans*, 516 U.S. 59, 74-75, 116 S.Ct. 437 (1995). Assuming actual reliance is proven, the creditor must also show that such reliance was justifiable. Justifiable reliance is an intermediate, subjective standard positioned between "reasonable" reliance and "mere" reliance. *Field v. Mans*, 516 U.S. at 72-73; *In re Griffith*, 568 B.R. 444, 456 (Bankr. D. Utah 2017). Justifiable reliance means that "[a] person is required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Fields,* 116 U.S. at 71; *Griffith*, 568 B.R. at 456. For purposes of § 523(a) (2)(A) actions, a creditor's reliance is unjustified "only where, under the circumstances, the fact should be apparent to one of his knowledge and intelligence from a cursory glance,

or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own." *Fields*, 116 U.S. at 71, citing W. Prosser, Law of Torts § 108, p. 718(4th ed. 1971).

## V. Discussion

As noted above, § 523(a)(2)(A) contains three distinct claims: false pretenses, false representation and actual fraud. Each of these claims require different elements of proof. In its pleadings the Bank alleged, in conclusory language, that it was seeking to recover for each of the three claims. It is clear to the Court, however, that the bank placed primary emphasis on "misrepresentation" as the basis of non-dischargeability. Before addressing the evidence applicable to each of the three claims, the Court feels compelled to state that there is a substantial question in the Court's mind as to whether Plaintiff was asserting any claim other than misrepresentation.

As is typical in many cases brought under § 523(a)(2)(A), the parties in the present case focused on the ground of a fraudulent representation. Here, the Plaintiff did not separate the claims for, and the distinct elements of, false pretenses, misrepresentation and actual fraud. The allegations in the Complaint and the Final Pretrial Order simply state in conclusory language that the Defendants obtained the "Agreement through and by false pretenses, false representations or actual fraud and to the Plaintiff's detriment". Further, both the Complaint and the Final Pretrial Order set forth only the elements for misrepresentation, applying the *In re Young* elements for false representation. The parties stipulated in the Final Pretrial Order that:

> H. Under Section 523(a)(2)(A), Plaintiff must prove (I)
> Defendants made a false representation, (ii) with the intent

16

> to deceive Plaintiff, (iii) Plaintiff relied on the representation, (iv) Plaintiffs' reliance was justifiable, and (v) Defendants' representation caused Plaintiff to sustain a loss. *See In re Riebesell,* 586 F.3d 782, 789 (10th Cir. 2009) (stating elements for a claim under Section 523(a)(2)(A)).

[Doc. 34 ¶ I(H)].  Likewise, the Final Pretrial Order stipulated that the only Legal/Factual Issue was whether the Defendants made a false representation(s) with the intent to deceive, whether Plaintiff justifiably relied on the false representation(s) and whether Defendant's false representation caused Plaintiff to sustain a loss. [Doc. 34 ¶ I (K)].

In closing argument at trial Plaintiff's counsel exclusively argued the elements for false representation.  The Court specifically asked counsel, "I think it is clear from the evidence, that what you're basing this on is *a lack of representation* ...so where is the false representation, the withholding of the information ... you're saying there is an omission -but where is the false fact, the false representation? Counsel did not respond by stating that an omission could have constituted "false pretenses" or "actual fraud" but reiterated the false representation elements.  It thus appears  from the pleadings and argument that the Plaintiff was (1) pursuing a claim based solely upon misrepresentation and not false pretenses or actual fraud or (2) believed that the elements required for false pretenses or actual fraud were the same as those for false representation.

Under such circumstances, the Court could find that Plaintiff waived or abandoned any claim for false pretenses or actual fraud. See, *In re Munoz*, 536 B.R. 879, 884-885 (Bankr. D. Colo. 2015); *In re Henderson,* 134 B.R. 147, 155 (Bankr. E.D. Pa.1991). The Court elects not to make such a finding; rather, the Court will address all three claims on their merits.

17

Simply put, this is not a false representation case. It is undisputed the Baumgardners did not make any misrepresentation. The Bank's claim in this case hinges on whether it was defrauded by the failure of the Baumgardners to advise it of the status of the first mortgage before entering into the Agreement and, to a lesser degree, failing to advise the Bank of the first mortgagee's foreclosure action after entering into the Agreement. King, Mike and Tye all testified that Mike and/or Tye *never made any representation* as to whether the first mortgage was current, delinquent or in default. It was also clear that King never made any inquiry as to the status of payments on the first mortgage. Likewise, the Baumgardner's never made any representation, or even any mention, of SLS's foreclosure action. The Baumgardner learned of the foreclosure on July 6, 2015, three weeks after signing the Agreement. The Bank learned of the foreclosure when it was served with summons in November 2015, five months after entering into the Agreement. Since there was no false representation, the Court need not address the remaining elements necessary to establish that claim.

The Bank's strongest claim under § 523(a)(2)(A), although the Bank never articulated it as such, is one for false pretenses. As stated above, unlike false representations, which are express misrepresentations, false pretenses include conduct and material omissions. *In re Sturgeon*, 496 B.R 215, 223 (10th Cir. BAP 2013). In an ideal world, should the Baumgardners have told the Bank about the default on the first mortgage with SLS? Yes. Also, in an ideal world King should have asked about the status of the first mortgage. Such omissions, both on the part of the Baumgardner and the Bank, are easy to understand under the circumstances. The Baumgardners were in a financial free-fall, and were willing to give the Bank everything that they had to get it paid. At the

18

same time, King was aware of the Baumgardners' financial situation, i.e they were behind on all their obligations to the Bank, behind on all their credit cards, and the Bank had downgraded their credit status from "substandard" to "doubtful". FICO credit scores of 477 and 502 said it all. Yet the Bank was still trying to shore up its position by taking a second mortgage in property which all parties thought had sufficient equity and the Baumgardners were willing to grant this lien in an effort to make the Bank whole. In hindsight the issue of the status of the first mortgage should have been discussed, but it is understandable that in the exigencies of the moment it was not.

In determining an issue of non-dischargeability under § 523(a)(2)(A) the Court must keep in mind that any claim under that section requires a finding that the debtor must have acted with the *subjective intent to deceive the creditor*. *First National Bank v. Cribbs (In re Cribbs),* 327 B.R. 668, 674 (10th Cir. BAP 2005). The Tenth Circuit has said that fraud "is never imputed or presumed and the court should not sustain findings of fraud upon circumstances which at the most create only a suspicion." *In re Luna,* 2011 WL 144906 (Bankr. D. N. M. 2011) (citing *Houston Oilers, Inc. v. Neeley*, 361 F.2d 36, 41 (10th Cir.), *cert. denied*, 385 U.S. 840 (1966)). Fraud will not be imputed to any party on the facts and circumstances out of which it is supposed to arise are consistent with honesty and purity of intention. *Guinand v. Atlantic Richfield Co*., 485 F.2d 414, 418 n. 3 (10th Cir.1973); *Funnell v. Jones*, 1985 OK 73 ¶ 8, 737 P.2d 105, 108 ("When a transaction is fairly susceptible of two constructions, the one which will free from the imputation of fraud will be adopted.").

Tye presented as an honest, persuasive, and credible witness.[4]  The Court believes that she and Mike negotiated and entered into the Agreement in good faith and that their goals were to save themselves from as much financial ruin as possible and reduce their personal liability to the Bank to the maximum extent possible.  The Court finds that the Baumgardner's lacked an intent to deceive the Bank leading up to and at the time of the execution of the Agreement.  The Court declines to find a misrepresentation to be implied from the surrounding facts or due to the Baumgardners' silence in not mentioning the status of the first mortgage.

The Court having found that there was no misrepresentation and there was no omission with the requisite wrongful intent/scienter, there is no basis to find that they engaged in "actual fraud".  This was not an intentional "scheme to deprive or cheat" the Bank. *Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1,11 (10th Cir. BAP 2016).  This was an all too common situation in which distressed debtors attempt to do their best to cobble together as many assets as possible to give to the Bank which was aggressively pursuing its remedies.  The Baumgardners didn't handle the situation perfectly, but they did not do it fraudulently.

## VI.  Conclusion

Based upon the totality of the circumstances and weighing the evidence, the Court finds that in connection with the Loan Settlement Agreement  Mike and Tye Baumgardner did not misrepresent the status of the first mortgage either by a positive assertion or by their silence or to be implied from the facts, and lacked the intent to deceive to meet the

---

[4] The omission of Mike from this sentence is not an inference of him being other than honest and credible; rather, he had not been very much involved in dealing with the bank and offered little substantive information.

requirements of § 523(a)(2)(A).[5]  Therefore, the debt owed to the First State Bank Noble, Oklahoma is dischargeable.  Any personal liability that Michael and Tye Baumgardner may have as a result of the State Court Judgment in favor of First State Bank Noble is therefore extinguished.  Pursuant to Fed. R. Bankr. P. 9021, a separate Judgment will be entered contemporaneously with this Opinion.  Accordingly, it is hereby

**ORDERED**, that the Complaint for Determination of Dischargeability is dismissed;

**IT IS FURTHER ORDERED**, that a discharge shall be issued to Debtors, Michael Alan Baumgardner and Tyelinda Maxine Baumgardner.

**# # #**

---

[5]With this ruling, the Court does not need to address the reliance, materiality or proximate cause elements of § 523(a)(2)(A).  It also need not address the issue of the parole evidence rule raised by the Baumgardners.